**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

AMERICAN HOSPITAL ASSOCIATION and HEALTH FORUM LLC,

Plaintiffs,

v.

PATIENTRIGHTSADVOCATE.ORG, INC.

Defendant.

Case No. 1:25-cv-15137

Judge Martha M. Pacold

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Jonathan C. Bond (*pro hac vice*)
Elizabeth P. Papez
Howard S. Hogan (*pro hac vice*)
Heather L. Skrabak (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
JBond@gibsondunn.com
EPapez@gibsondunn.com
HHogan@gibsondunn.com
HSkrabak@gibsondunn.com

Patrick J. Fuster (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Phone: (213) 229-7000
PFuster@gibsondunn.com

*Counsel for Plaintiffs American Hospital Association and Health Forum LLC*

# TABLE OF CONTENTS

**Page**


INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................3

A. The AHA Creates Codes And The *Manual* To Streamline Hospital Billing..........3

B. Governments Use, But Do Not Dictate, The AHA's Codes And *Manual* .............4

C. The AHA Updates The *Manual* And Offers Licenses To Annual Editions ...........5

D. PRA Threatens To Post The *Manual* Online .......................................................6

LEGAL STANDARD................................................................................................7

ARGUMENT ..........................................................................................................7

I. The AHA Stated A Complete Claim Of Copyright Infringement ..........................7

A. The AHA's Copyright In The *UB-04 Manual* Is Valid .............................8

1. The AHA, Not The Federal Government, Is The *Manual*'s Author ..........................................................................8

2. References To The *Manual* In Laws Do Not Destroy The Copyright ....................................................................13

B. The No-Contest Provision Bars PRA's Challenge To Copyrightability ...........................................................................20

C. Posting Of The Entire *UB-04 Manual* Online Is The Antithesis Of Fair Use...............................................................................22

II. The AHA Stated A Complete Claim Of Breach Of The Confidentiality Provisions.......................................................................................24

A. Federal Law Poses No Bar To The License's Confidentiality Provision ........................................................................25

B. Illinois Law Does Not Invalidate PRA's Contractual Commitment .........28

III. The AHA Stated A Complete Claim Of Breach Of The No-Contest Provision ..........................................................................................29

CONCLUSION.....................................................................................................30

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ahn v. Midway Mfg. Co.*,
965 F. Supp. 1134 (N.D. Ill. 1997) ....................10

*Allen v. Cooper*,
589 U.S. 248 (2020)....................18

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988)....................14

*Am. Access Cas. Co. v. Reyes*,
1 N.E.3d 524 (Ill. 2013) ....................21, 28

*Am. Dental Ass'n v. Delta Dental Plans Ass'n*,
126 F.3d 977 (7th Cir. 1997) ....................12, 23

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
896 F.3d 437 (D.C. Cir. 2018) ....................17, 23

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
82 F.4th 1262 (D.C. Cir. 2023)....................22

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023)....................22

*Apple Inc. v. Psystar Corp.*,
658 F.3d 1150 (9th Cir. 2011) ....................27

*Aronson v. Quick Point Pencil Co.*,
440 U.S. 257 (1979)....................26

*Assessment Techs. of WI, LLC v. WIREdata, Inc.*,
350 F.3d 640 (7th Cir. 2003) ....................27, 28

*Bates v. Arizona*,
433 U.S. 350 (1977)....................14

*BBL, Inc. v. City of Angola*,
809 F.3d 317 (7th Cir. 2015) ....................25

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................7

*Bituminous Cas. Corp. v. Com. Union Ins. Co.*,
652 N.E.2d 1192 (Ill. App. Ct. 1995) ....................29

*BMG Music v. Gonzalez*,
430 F.3d 888 (7th Cir. 2005) ....................24

**Cases *(continued)*** **Page(s)**

*Bontkowski v. Smith*,
305 F.3d 757 (7th Cir. 2002) ....29

*Bowers v. Baystate Techs., Inc.*,
320 F.3d 1317 (Fed. Cir. 2003)....26, 28

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001)....11

*Brownmark Films, LLC v. Comedy Partners*,
682 F.3d 687 (7th Cir. 2012) ....22

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)....23

*Canadian Standards Ass'n v. P.S. Knight Co.*,
112 F.4th 298 (5th Cir. 2024) ....16

*CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*,
44 F.3d 61 (2d Cir. 1994) ....15, 17, 18, 20

*Chicago Bd. of Educ. v. Substance, Inc.*,
354 F.3d 624 (7th Cir. 2003) ....22, 24

*Cmty. for Creative Non-Violence v. Reid*,
846 F.2d 1485 (D.C. Cir. 1988)....11

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989)....8

*Estate of Darger v. Lerner*,
665 F. Supp. 3d 931 (N.D. Ill. 2023) ....9

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
36 F.3d 1147 (1st Cir. 1994)....27

*Davidson & Assocs. v. Jung*,
422 F.3d 630 (8th Cir. 2005) ....26

*Eldred v. Ashcroft*,
537 U.S. 186 (2003)....19

*Erickson v. Trinity Theatre, Inc.*,
13 F.3d 1061 (7th Cir. 1994) ....10, 12

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)....19

*Gaylord v. United States*,
595 F.3d 1364 (Fed. Cir. 2010)....12

**Cases *(continued)*** **Page(s)**

*Georgia v. Public.Resource.Org, Inc.*,
590 U.S. 255 (2020) ............ 14, 15, 16

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) ............ 24

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) ............ 24

*Herbert v. United States*,
36 Fed. Cl. 299 (1996) ............ 10, 13

*Holmes v. Marion Cnty. Sheriff's Off.*,
141 F.4th 818 (7th Cir. 2025) ............ 7, 27

*Janky v. Lake Cnty. Convention & Visitors Bureau*,
576 F.3d 356 (7th Cir. 2009) ............ 9, 10

*Laff v. John O. Butler Co.*,
381 N.E.2d 423 (Ill. App. Ct. 1978) ............ 21

*Lasercomb Am., Inc. v. Reynolds*,
911 F.2d 970 (4th Cir. 1990) ............ 27, 28

*Lear v. Adkins*,
395 U.S. 653 (1969) ............ 20

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995) ............ 11

*Life Spine, Inc. v. Aegis Spine, Inc.*,
8 F.4th 531 (7th Cir. 2021) ............ 26, 29

*McCarty v. Jones*,
2024 WL 4347114 (N.D. Ill. Sept. 30, 2024) ............ 7

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ............ 30

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ............ 7, 24

*NCAA v. Tarkanian*,
488 U.S. 179 (1988) ............ 11, 14

*Nielsen Co. (US), LLC v. Truck Ads, LLC*,
2011 WL 3857122 (N.D. Ill. Aug. 29, 2011) ............ 16

*NUCOR Corp. v. Aceros Y Maquilas de Occidente*,
28 F.3d 572 (7th Cir. 1994) ............ 30

**Cases *(continued)*** **Page(s)**

*Philips N. Am. LLC v. Glob. Med. Imaging, LLC*,
2024 WL 4240920 (N.D. Ill. Sept. 19, 2024) ....28

*Prac. Mgmt. Info. Corp. v. Am. Med. Ass'n*,
121 F.3d 516 (9th Cir. 1997) ....15, 16, 18, 19, 20, 23, 24, 28

*ProCD, Inc. v. Zeidenberg*,
86 F.3d 1447 (7th Cir. 1996) ....25, 26, 28

*Rand McNally & Co. v. Fleet Mgmt. Sys., Inc.*,
591 F. Supp. 726 (N.D. Ill. 1983) ....19

*Reed-Union Corp. v. Turtle Wax, Inc.*,
77 F.3d 909 (7th Cir. 1996) ....28

*Saturday Evening Post Co. v. Rumbleseat Press, Inc.*,
816 F.2d 1191 (7th Cir. 1987) ....20, 21, 22

*Seshadri v. Kasraian*,
130 F.3d 798 (7th Cir. 1997) ....12

*Shager v. Upjohn Co.*,
913 F.2d 398 (7th Cir. 1990) ....8

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
689 F.3d 29 (1st Cir. 2012) ....22

*Sorenson v. Fio Rito*,
413 N.E.2d 47 (Ill. App. Ct. 1980) ....30

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021) ....29

*Veeck v. S. Bldg. Code Congress Int'l, Inc.*,
293 F.3d 791 (5th Cir. 2002) ....16

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
227 F.3d 1110 (9th Cir. 2000) ....23

**Constitutional Provisions**

U.S. Const. Art. I, § 8, cl. 8 ....1

U.S. Const. Amend. I ....19, 24

U.S. Const. Amend. V ....18

**Statutes**

Copyright Act of 1909, ch. 320, § 7, 35 Stat. 1077 ....14, 20

5 U.S.C. § 552(a)(1) ....19

**Statutes *(continued)*** **Page(s)**

17 U.S.C. § 101 ........ 8, 11, 13

17 U.S.C. § 105(a) ........ 9, 13, 14

17 U.S.C. § 107(1) ........ 22

17 U.S.C. § 107(2) ........ 23

17 U.S.C. § 107(3) ........ 23

17 U.S.C. § 107(4) ........ 24

17 U.S.C. § 201(b) ........ 8

17 U.S.C. § 301(a) ........ 25

17 U.S.C. § 410(c) ........ 8

42 U.S.C. § 1320d-1(c)(3) ........ 4

5 Ill. Stat. 140/1 § 1 ........ 28

**Regulations**

42 C.F.R. § 162.910(a) ........ 4

42 C.F.R. § 162.910(c) ........ 4

42 C.F.R. § 162.1002 ........ 4

45 C.F.R. § 1652.1102(a)(4) ........ 4

63 Fed. Reg. 25,272 (May 7, 1998) ........ 5

65 Fed. Reg. 50,312 (Aug. 17, 2000) ........ 4, 11, 18

65 Fed. Reg. 50,373, 50,373 (Aug. 17, 2000) ........ 4

Fla. Admin. Code § 69L-7.100(5) ........ 18

50 Ill. Adm. Code § 2908.50 ........ 28

**Rules**

Fed. R. Civ. P. 12(b)(6) ........ 1, 2, 7, 9, 25

11th Cir. R. 28-1(j) ........ 17

**Other Authorities**

H.R. Rep. No. 1476, 94th Cong., 2d Sess. (1976) ....................14

Letter from Associate Register of Copyrights to Hon. Diane P. Wood et al. (May 16, 2025)....................13

*Restatement of the Law of Copyright* (Tentative Draft No. 6 Apr. 2025) ....................13

S. Rep. No. 473, 94th Cong., 1st Sess. (1975)....................14

## INTRODUCTION

Defendant PatientRightsAdvocate.org, Inc. (PRA) labels its filing a motion to dismiss, but it does not resemble one. At the Rule 12(b)(6) stage, the Court accepts the complaint's allegations as true, draws all reasonable inferences in the plaintiff's favor, and asks only whether the complaint plausibly alleges each element of the claim. That familiar inquiry is straightforward here because PRA does not argue that any element is missing. Instead, PRA asks the Court to disregard the complaint's allegations and adopt a (false) counternarrative culled from a cherrypicked collection of nearly 200 pages of materials outside the pleadings, to draw inferences *in PRA's favor*, and to dismiss not because of an absent element but based on a series of premature affirmative defenses. Rule 12 does not permit that maneuver. None of PRA's defenses can be sustained on the face of the complaint or through undisputed facts properly subject to judicial notice, so they are all off-limits. Many of them, in fact, fail as a matter of law irrespective of factual development.

The complaint contains all the Court needs to deny PRA's motion. At great expense and over many years, Plaintiff American Hospital Association (AHA) created and continuously revises billing codes that allow healthcare payers and providers to use a standardized form for reimbursement claims. Compl. ¶¶ 35-38. The AHA publishes the codes and detailed instructions for using them in annual editions of the *Official UB-04 Data Specifications Manual*, which the AHA licenses for a tiny fraction of the value it adds for the healthcare industry. ¶¶ 41-44. In formulating, updating, and maintaining the *Manual*, the AHA has created just the sort of original expression that copyright law protects by granting "Authors" an "exclusive Right." U.S. Const. Art. I, § 8, cl. 8.

PRA seeks to discourage that creative enterprise by eliminating copyright protection for works like the *Manual*. After acquiring a license—and expressly agreeing not to disclose it to others or to challenge its copyright—PRA sent the AHA a threat: It demanded that the AHA acquiesce to PRA's planned posting of the entire *Manual* online so that it is "freely available to

the world," or risk imminent litigation attacking the AHA's copyright. Compl. ¶ 6. PRA's threat forced the AHA to file this action to protect its copyright and contractual rights.

The complaint more than plausibly states a complete claim of copyright infringement, and PRA does not dispute that the AHA pleads every element. PRA principally argues instead that the AHA's copyright is invalid based on shifting accounts of how the *UB-04 Manual* is supposedly a government work or a government edict. But PRA never grapples with the complaint's factual allegations—backed by the presumption of validity from the copyright registration and grounded in reality—that the AHA creates the *Manual* as a private work after consulting with experienced industry stakeholders. PRA also ignores that every federal court of appeals to decide the issue has rejected PRA's legal contention that a privately authored work loses copyright protection if federal or state laws refer to the work or require regulated parties to consult it. PRA's contractual pledge not to contest the AHA's rights in the *Manual* independently bars its challenge to the AHA's copyright. And in trying to defend its threatened infringement as fair use, PRA improperly piles inference upon unjustified inference in its *own* favor while disregarding the complaint's allegations.

The complaint also plausibly states complete breach-of-contract claims based on PRA's threatened disclosure of the *UB-04 Manual* and its assault on the AHA's copyright. PRA again responds only with affirmative defenses of copyright misuse and public policy, both beyond the proper scope of Rule 12(b)(6). Even if those defenses were fair game at this stage, they are legally foreclosed: Copyright misuse is not a defense to breach of contract and, even where it does apply, requires anticompetitive conduct that is absent here. PRA's public-policy defense is equally meritless and simply repackages its flawed arguments that the privately authored *Manual* somehow became "the law." Neither one immunizes PRA from the consequences of breaking its promises.

PRA's motion to dismiss should be denied.

## BACKGROUND

### A. The AHA Creates Codes And The *Manual* To Streamline Hospital Billing

Founded in 1898, the AHA today represents 5,000 hospitals, healthcare systems, and other healthcare organizations, and has more than 42,000 individual members. Compl. ¶ 20. The AHA fulfills its mission of advancing health outcomes through advocacy, education, research, and setting standards to promote quality, affordable, and accessible care for everyone. ¶¶ 1, 21. Until the 1970s, when the AHA first became involved in drafting billing codes, payers across the country required hospitals to bill using their own unique code sets, with unique billing information and forms. ¶ 27. That inefficient jumble of code sets harmed hospitals, payers, and patients. *Id.*

The AHA started to cut through that cacophony of codes in 1975 by creating the National Uniform Billing Committee (NUBC), which the AHA established to assist in developing a standardized data set and billing form. Compl. ¶ 28. The NUBC is and has always been led, managed, and funded by the AHA. ¶ 29. The AHA is the NUBC's secretariat, and AHA employees serve permanently as its Chair and Secretary. *Id.* Together, the Chair and Secretary oversee and orchestrate the NUBC's review of proposed changes—which they frequently draft—to the uniform form, codes, and data set. *Id.* The NUBC's other members are volunteers drawn from providers, governmental and nongovernmental payers, health IT vendors, state hospital associations (which the AHA selects as members), and other industry stakeholders. ¶ 30; Doc. 31-1 at 3.

The fruits of this process have belonged to the AHA from the beginning. When joining the NUBC, each member expressly disclaims ownership of any proprietary right in the AHA's codes and acknowledges that the AHA alone holds such proprietary rights, including the copyrights. Compl. ¶ 30. The AHA launched the standardized UB-82 Form, data set, and supporting materials in 1982. ¶ 31. But the AHA's work was far from done. Over the years, the AHA has continually refined and updated the codes and instructions through the NUBC process that the

AHA established and oversees, including by offering a redesigned (UB-92) Form and publishing an updated *UB-92 Manual* containing the code set and instructions for using them. ¶ 34. The *UB-04 Manual* at issue here, updated annually, is the successor to those iterative efforts.

### B. Governments Use, But Do Not Dictate, The AHA's Codes And *Manual*

A decade after the AHA created the UB-82 form, the federal government—a healthcare payer through Medicare, Medicaid, and other programs—convened a task force, the Workgroup for Electronic Data Interchange, to explore streamlining hospital administration. Compl. ¶ 32. That Workgroup found in 1992 that "existing standards setting groups, such as the National Uniform Billing Committee * * * , have achieved some measure of uniformity and, in doing so, reduced the cost and burden associated with claims submission and processing." *Id.*

Recognizing the benefits of private standard-setting, Congress enacted the Health Insurance Portability and Accountability Act of 1996 (HIPAA), which directed the Department of Health and Human Services (HHS) to establish uniform procedures for health transactions. Compl. ¶ 33. HHS has since adopted regulations under HIPAA that require claims submitted electronically to use particular standards for the use of electronic healthcare data. *Id.* HHS adopted the *ASC X12N 837—Health Care Claim: Institutional* (the *837I* Form) as one such standard. 45 C.F.R. § 1652.1102(a)(4); *see* 65 Fed. Reg. 50,312, 50,333 (Aug. 17, 2000). HHS named the NUBC as one of six Designated Standard Maintenance Organizations to consult and provide input on the specific standards that HHS has "adopted under" HIPAA, such as the *837I* Form. 42 U.S.C. § 1320d-1(c)(3); *see* 42 C.F.R. § 162.910(a); 65 Fed. Reg. 50,373, 50,373 (Aug. 17, 2000). HHS must approve any changes to those HIPAA standards. 42 C.F.R. § 162.910(c).

HHS has *not* adopted the AHA's UB-04 codes and *Manual* as HIPAA standards for which modifications must be approved by HHS with input from the Designated Standard Maintenance Organizations. *Cf.* 42 C.F.R. § 162.1002 (adopting different code sets). To the contrary, as HHS

explained, "the private sector, with public sector involvement, continue[s] to have responsibility for defining the data element *content*" used in HIPAA-governed forms. 63 Fed. Reg. 25,272, 25,298 (May 7, 1998) (emphasis added). The *837I* Form thus takes the AHA's codes (among other privately authored data elements) as it finds them. *Id.* at 25,316. The federal government and many States have also standardized billing for their healthcare programs by requiring use of the AHA's privately formulated codes. Compl. ¶¶ 39-40.

### C. The AHA Updates The *Manual* And Offers Licenses To Annual Editions

The AHA has continued, after HIPAA as before, to spearhead the process of updating its codes to reflect developments in the industry. Compl. ¶¶ 35-38. Shortly after HIPAA's enactment, the AHA led a four-year study to update its codes. ¶ 34. Based on its study, the AHA overhauled the UB-92 codes, publishing the *UB-04 Manual* in 2006 and annual updated versions in each successive year. *Id.* Anyone—providers, public and private payers, other stakeholders, or even members of the public—may ask for changes to the *Manual* and its codes. ¶¶ 35-36. AHA staff review requests, research the suggested changes, determine which requests to present to the NUBC's members, and frequently draft the specific language for code updates and accompanying instructions. ¶ 36. If the NUBC votes to approve a change, AHA employees select where and how the new content should be included in the *Manual*, and then release the updated version. ¶ 37. This entire process occurs without any oversight by federal or state authorities. Doc. 31-1 at 12-13.

The AHA owns the copyrights to the *UB-04 Manual*, including the most recent 2026 edition at issue here, and it offers licenses through its wholly owned subsidiary, Health Forum LLC. Compl. ¶¶ 43, 47. When purchasing a license for up to 50 users, a purchaser agrees to a standard end-user license agreement. ¶¶ 44, 48. Purchasers make several important promises in the license agreement: They agree to not "share, broadcast, distribute, sell, lease, loan, transfer, reverse engineer, disassemble, modify, create derivative works of" the "products, data and other material" in

the *Manual*. ¶ 50 (quoting Doc. 1-3 § 1). They agree to keep such content "confidential" and not to "disclose the Content to any third party or allow any third party to have access to the Content." ¶ 51 (quoting Doc. 1-3 § 4). And they "acknowledge and agree" that "all Content is the proprietary and confidential information of Licensor and its licensors" (*i.e.*, the AHA and Health Forum); "that Licensor and its licensors own all copyrights, trademarks, patents, trade secrets and other proprietary rights in and to the Content"; and that they "will not challenge Licensor's and its licensors' proprietary rights in and ownership of the Content." ¶ 52 (quoting Doc. 1-3 § 4).

The *Manual*'s copyright protection and licensing agreement protect the AHA's ongoing investment in continual updates and improvements. Compl. ¶ 4. AHA employees who staff the NUBC exercise creativity and judgment that requires the dedication of substantial time and resources. ¶¶ 35-38. If the AHA could not prevent unauthorized dissemination, its ability and incentive to continue updating and improving its content would be severely undermined. ¶ 4.

### D. PRA Threatens To Post The *Manual* Online

On November 13, 2025, PRA sent a demand letter to the AHA. Compl. ¶ 58. That letter represented that "PRA has purchased access to the *Official UB-04 Data Specifications Manual, 2026 Edition*" and "plans to make the *Manual* freely available online to the public at large." Doc. 1-4 at 1. Asserting that federal and state laws require use of UB-04 codes to obtain reimbursement on certain claims, PRA contended that "the *Manual* is not a copyrightable work because it has been incorporated by reference into legally binding regulations." *Id.* at 2. PRA also argued that "the fair use doctrine permits PRA to make the *Manual* available to the general public." *Id.* PRA stated that, if the AHA did not agree (by December 15) "that it will take no legal action against PRA for making the *Manual* publicly available online," PRA would "consider litigation to confirm PRA's legal rights regarding this matter." *Id.* at 3.

Rather than accede to PRA's demands, the AHA and Health Forum filed this action before PRA's unilateral deadline to prevent PRA's threatened infringement of the AHA's copyright in the *UB-04 Manual* and to enforce its contractual rights. Compl. ¶¶ 66-110.

## LEGAL STANDARD

Under Rule 12(b)(6), a complaint need plead only "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), drawing all "reasonable inferences" in the AHA's favor, *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 195 (2024). PRA could prevail on an affirmative defense only if it "is clear from the face of the complaint." *Holmes v. Marion Cnty. Sheriff's Off.*, 141 F.4th 818, 822 (7th Cir. 2025). As this Court has explained, dismissal based on an affirmative defense "at the pleading stage is an unusual step"—as "a complaint need not anticipate and overcome affirmative defenses"—and is warranted only if the plaintiff "pleads himself out of court by alleging facts sufficient to establish" the defense. *McCarty v. Jones*, 2024 WL 4347114, at *2 (N.D. Ill. Sept. 30, 2024) (citations omitted).

## ARGUMENT

### I. The AHA Stated A Complete Claim Of Copyright Infringement

PRA neither points to any necessary element of copyright infringement that is missing in Count I nor disputes the plausibility of the complaint's allegations. Disregarding the pleading standard and those allegations, PRA instead attacks the validity of the AHA's copyright based on a constellation of facts outside the complaint and defends its threatened publication of the *Manual* as fair use. PRA's invalidity defense is meritless and contravenes its contractual pledges. And its fact-intensive affirmative defense of fair use cannot be conclusively resolved at this stage and rests on a warped conception of both copyright law and the *Manual*.

### A. The AHA's Copyright In The *UB-04 Manual* Is Valid

PRA's validity attack ignores the complaint's allegations and comes nowhere close to overcoming the presumption of the "validity of the copyright" in the *UB-04 Manual*. 17 U.S.C. § 410(c). The AHA—not any government—is the *Manual*'s author. And the *Manual* did not lose copyright protection because laws require regulated parties to consult that privately authored work.

#### 1. The AHA, Not The Federal Government, Is The *Manual*'s Author

The registration for the 2026 version of the *UB-04 Manual* identifies the AHA as the sole author of a work made for hire. Doc. 1-1 at 1. The "facts stated in the certificate" are presumed correct, 17 U.S.C. § 410(c), and the complaint's allegations forcefully confirm them.

The AHA authors the *Manual*. Like any other incorporeal entity, the AHA "acts only through agents." *Shager v. Upjohn Co.*, 913 F.2d 398, 404 (7th Cir. 1990). It established the process for updating the *Manual* through which AHA employees review requests for changes to the UB-04 codes, "determin[e] whether a proposed change warrants presentation to the NUBC's members," and "frequently draf[t] specific language for code updates" and accompanying "written material." Compl. ¶¶ 28-29, 36. After the NUBC votes to approves a change, "AHA employees arrange the new or revised codes and accompanying written material," "select where and how within the *UB-04 Manual* new content should be presented," and then publish updates. ¶ 37. AHA employees thus create the *Manual*—the "fixed, tangible expression entitled to copyright protection"—in every relevant sense. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). And because those AHA employees act "within the scope of [their] employment" in creating the *Manual*, 17 U.S.C. § 101, the Copyright Act deems the AHA to be "the author" and the owner of "all of the rights comprised in the copyright," *id.* § 201(b).

PRA's motion ignores those well-pleaded allegations. Instead, PRA focuses singularly on the fact that federal agencies have representatives who are voting members of the NUBC and (like

anyone) can request changes to the *Manual*. Doc. 31 (Mot.) at 11-15. PRA contends that those agencies' participation alongside their private-payer counterparts makes the whole *Manual* ineligible for copyright as a "work of the United States Government." 17 U.S.C. § 105(a). That argument is out of bounds under Rule 12(b)(6): It "not only relies on extraneous documents and evidence, but also asks the Court to draw inferences" *for PRA*, the defendant—"an inversion of the motion to dismiss standard." *Estate of Darger v. Lerner*, 665 F. Supp. 3d 931, 939 (N.D. Ill. 2023).

In any event, PRA's jumbled government-authorship theories lack merit. PRA's arguments all assume that the NUBC is the *Manual*'s author, but that is legally and factually wrong. And it would not matter anyway because the NUBC is not the federal government and wields no federal authority in considering changes to the *Manual* that the AHA drafts and implements. The limited role played by federal agencies in that process in their capacity as payers (not regulators) does not make it a government work.

***Neither the NUBC nor its members are the authors of the* Manual.** The common premise of PRA's various government-authorship arguments is that either the NUBC as an entity or the NUBC's constituent members collectively author the *Manual*. But even apart from PRA's reliance on outside-the-complaint facts, that premise stumbles off the starting blocks because it depends on the existence of a joint work. PRA does not and cannot show a joint work for at least two reasons.

*First*, a joint work would require that someone other than the AHA's employees—who, as the complaint makes clear, principally draft and organize the *Manual*'s text—made a "contribution of independently copyrightable material." *Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009). PRA cannot point to any. Because "published creations are almost always collaborative efforts to some degree," a joint author's contributions must go "beyond general '[i]deas, refinements, and suggestions'"—or else "'copyright would explode.'" *Id.*

at 363 (citation omitted). PRA cites (Mot. 13) only the NUBC's *votes* on proposed changes. But the act of voting is "mere direction" to the AHA's employees for how to refine the *Manual* that does not contribute expression that "'could stand on its own as the subject matter of a copyright.'" *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1070-71 (7th Cir. 1994) (citation omitted).

*Second*, as PRA admits (Mot. 12), its *Janky* joint-work theory would require that NUBC members "*intended* to be joint authors at the time the work was created." *Erickson*, 13 F.3d at 1070 (emphasis added). PRA's threadbare statement that "[t]he NUBC's members intend to create a joint work" (Mot. 12) contradicts the complaint's allegation that NUBC members agree "that the AHA does and will own the copyright in each successive version of the *UB-04 Manual*." Compl. ¶ 70. Although the Court need not rely on it, PRA's own outside-the-pleadings exhibit confirms the point. Doc. 31-1, at 14 ("Each member organization relinquishes any claim to copyright ownership of data content and any material developed by the NUBC."). Because the NUBC's members disclaimed any interest in the content they develop, they are not joint authors of the *Manual*. *See Ahn v. Midway Mfg. Co.*, 965 F. Supp. 1134, 1140 (N.D. Ill. 1997); *cf. Janky*, 576 F.3d at 361-62 (joint work where co-authors were listed); *Herbert v. United States*, 36 Fed. Cl. 299, 309 (1996) (joint work where contributor "expected that the Committee members [would] be listed equally as co-authors").

***The NUBC is not a government author.*** Even if the NUBC were an (or the) author of the *Manual*, § 105(a) would not disentitle the *Manual* to copyright protection because the NUBC is not the government. The AHA, not Congress, created the NUBC. Compl. ¶ 28. PRA's motion concedes that the NUBC is an "unincorporated association," Mot. 2 (citing Doc. 31-1 at 3)—a far cry from a federal agency. Nor has Congress ever deemed the NUBC to be part of the federal government. The NUBC's private status therefore governs for "matters that are within Congress's

control," *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995), which includes defining "work[s] prepared by an officer or employee of the United States government," 17 U.S.C. § 101.

The general rule that an unincorporated association with "public and private member[s]" remains a "private party" confirms that conclusion. *NCAA v. Tarkanian*, 488 U.S. 179, 193-94 (1988) (holding that participation of state university in NCAA did not transform NCAA rules into state action). The rule applies here because the NUBC is a "collective membership," not a federal "surrogate." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 297 (2001); *see* Mot. 2. So even if the NUBC were an author, the AHA could still hold the copyright on its behalf. *Cmty. for Creative Non-Violence v. Reid*, 846 F.2d 1485, 1488 n.3 (D.C. Cir. 1988), *aff'd on other grounds*, 490 U.S. 730.

PRA's argument (Mot. 10-11) that the NUBC is nevertheless a federal-government actor because the HHS named the NUBC as a Designated Standard Maintenance Organization is baseless—and illustrates the pitfalls of a defendant's reliance on a mistaken one-sided gloss on outside-the-pleadings materials in a motion to dismiss. As discussed, the Designated Standard Maintenance Organizations weigh in on *different* standards—not the UB-04 codes, which are not subject to any supervision or approval by HHS, but rather HIPAA electronic-data standards and billing forms. *See* pp. 4-5, *supra*. HHS itself stated that "nothing in [its] final rule" adopting those HIPAA standards "divest[ed] any copyright holders of their copyrights in any work referenced in this final rule." 65 Fed. Reg. at 50,324. The most PRA can say is that HHS adopted standards that in turn require the use of the UB-04 codes. Compl. ¶ 33. But neither the AHA nor the NUBC "exercises delegated federal authority" (Mot. 10) in revising the *Manual*. *See* Part I.A.2, *infra*.

***CMS's requests for changes do not make it an author.*** Retreating to still more outside-the-complaint allegations, PRA contends (Mot. 14) that the Centers for Medicare and Medicaid

Services (CMS) is a "joint autho[r]" of the *Manual* because it has sometimes successfully requested particular changes to the *Manual*. But even if alternative facts were fair game under Rule 12, PRA's "joint work" argument based on CMS change requests is even more attenuated than its misguided argument that the NUBC or its members are joint authors. *See* pp. 9-10, *supra*.

The few change requests PRA cites cannot establish a joint work. A single code, standing alone, is not "significant copyrightable material." *Seshadri v. Kasraian*, 130 F.3d 798, 803 (7th Cir. 1997). A code gains its meaning within the "scheme of classification." *Am. Dental Ass'n v. Delta Dental Plans Ass'n*, 126 F.3d 977, 979 (7th Cir. 1997). And by requesting changes to the *Manual* (as anyone may do) that *the NUBC* decides whether to accept or reject, CMS merely makes suggestions, which cannot make it a joint author. *Gaylord v. United States*, 595 F.3d 1364, 1379 (Fed. Cir. 2010) (federal agency did not jointly author Korean War Veterans Memorial by making "suggestions" for statues). Just as a "helpfully commenting colleague" does not become the joint author of a "scholarly paper" merely by offering input, *Seshadri*, 130 F.3d at 803, stakeholders who request changes are not joint authors if the NUBC votes to adopt them (even over, say, CMS's dissenting vote), Compl. ¶ 37; *see, e.g.*, *Erickson*, 13 F.3d at 1071-72 ("The fact that one actor [in a play] suggested that [the playwright] include a passage from *Macbeth* and an introduction to the play does not make him a joint author."). That is especially true of NUBC members like CMS who "expressly disclai[m] ownership or any proprietary right in the AHA's codes." Compl. ¶ 30. CMS is not a joint author.

***Federal officials' participation does not destroy the* Manual*'s copyright.*** PRA's reliance on federal agencies' participation in the NUBC process as payers—whether through membership on the NUBC or in requesting changes—is independently unavailing because it cannot destroy the AHA's private copyright. PRA argues (Mot. 11) that the *Manual* is a "work of the United States

Government," 17 U.S.C. § 105(a), but PRA does not and could not plausibly assert (directly contrary to the complaint's allegations) that the *Manual* is exclusively, or even substantially, a "work prepared by an officer or employee of the United States Government," *id.* § 101. PRA's apparent position that even a morsel of federal-employee participation transforms an entire private work like the *Manual* into an uncopyrightable creation of the federal government is illogical and lacks any basis in law. That implausible understanding would mean that many private works that federal employees help develop (alongside many others) are ineligible for copyright protection. Consider, for example, the American Law Institute's draft *Restatement of the Law of Copyright* (Tentative Draft No. 6 Apr. 2025), for which multiple federal officers and judges have served as "Advisers," *id.* at vi-vii—and on which the U.S. Copyright Office has commented, *e.g.*, Letter from Associate Register of Copyrights to Hon. Diane P. Wood et al. (May 16, 2025), https://tinyurl.com/34sex97j. On PRA's view, federal input renders such works wholly uncopyrightable—even if that input is *rejected*. Section 105(a) does not stretch so far. When confronted with works containing partial contributions from the federal government, courts unsurprisingly have suggested that non-federal contributors *could* assert their own rights under copyright law. *E.g.*, *Herbert*, 36 Fed. Cl. at 310-11. PRA's dearth of precedent for its contrary position (Mot. 12) speaks volumes.

### 2. References To The *Manual* In Laws Do Not Destroy The Copyright

PRA's principal theory in its demand letter (Doc. 1-4 at 1-2)—now buried as a backup (Mot. 15-19)—is that the *UB-04 Manual* morphed from a private work about billing codes into an uncopyrightable government edict when governments enacted laws referring to it and requiring parties to consult it. Every federal court of appeals that has passed on that position has rejected it. And for good reason: It fundamentally misconceives the relevant principle of federal copyright law, which makes government *authorship* of a work—not any other attribute—the critical criterion.

***The* Manual *is not the law.*** A private work does not lose copyright protection and enter the public domain whenever governments refer to the work or require its use. Neither the government's "decision to adopt [private] standards nor its minor role in their formulation" turns the private standards into the law—or the private association into a lawmaker. *Tarkanian*, 488 U.S. at 194-95 (citing *Bates v. Arizona*, 433 U.S. 350, 362 & n.12 (1977)); *see Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 495, 501 (1988) ("standard-setting by private associations" with "government" members is not exercise of "official authority").

That principle has been embedded in federal copyright statutes for more than a century. When denying copyright protection in 1909 to "any publication of the United States of the United States Government," Congress clarified that "the publication or republication by the Government, either separately or in a public document, of any material in which copyright is subsisting shall not be taken to cause any abridgment or annulment of the copyright or to authorize any use or appropriation of such copyright material without the consent of the copyright proprietor." Copyright Act of 1909, ch. 320, § 7, 35 Stat. 1077. The Copyright Act of 1976 carried forward the substance of that proviso by narrowly denying copyright protection only to "work[s] of the United States Government." 17 U.S.C. § 105(a). When translating old § 7 into new § 105, the drafters explained that "publication or other use by the Government of a private work would not affect its copyright protection in any way." H.R. Rep. No. 1476, 94th Cong., 2d Sess. 60 (1976); S. Rep. No. 473, 94th Cong., 1st Sess. 57 (1975).

PRA invokes (Mot. 16) "what has been dubbed the government edicts doctrine," *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 259 (2020), but PRA fundamentally misapprehends that framework. The Supreme Court explained in *Georgia* that the statutory basis for denying protection to "government edicts" is *not* an atextual ban on copyrighting material that "carries 'the

force of law'"; instead, the doctrine is simply an application of the Copyright Act's express *authorship* requirement. *Id.* at 265, 276. The Court distilled the government-edicts doctrine to a "straightforward rule" that turns "on the identity of the author": Copyright protection does not extend to works that judges "prepare 'in the discharge of their judicial duties'" or "work legislators perform in their capacity as legislators." *Id.* at 265-66 (citation omitted). But *Georgia* made clear that the government-edicts doctrine does *not* apply to "private parties" that "lack the authority to make or interpret the law." *Id.* at 265. Applying the government-edicts doctrine, the Court held that annotations to Georgia's statutes were not copyrightable because they were authored by a state committee in the exercise of its legislative duties, even though "prepared in the first instance by a private company (Lexis) pursuant to a work-for-hire agreement." *Id.* at 267; *see id.* at 267-69.

The Second and Ninth Circuits have squarely rejected the argument PRA makes here that private works enter the public domain whenever the government requires others to review or use those works. In *Practice Management Information Corp. v. American Medical Association*, 121 F.3d 516 (9th Cir. 1997), the Ninth Circuit held that a federal regulation requiring use of American Medical Association codes for Medicaid reimbursement did not strip the copyright protection from the underlying work. *Id.* at 519-20. And in *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.*, 44 F.3d 61 (2d Cir. 1994), the Second Circuit held that the Red Book did not lose copyright protection when state law required insurers to pay out at least a car's Red Book value. *Id.* at 73-74. The Supreme Court vindicated those decisions in *Georgia*, holding that, "instead of examining whether given material carries 'the force of law,' we ask only whether the author of the work is a judge or a legislator." 590 U.S. at 276. That precedent dooms PRA's position that laws cross-referencing or requiring consultation of a private work, such as the *UB-04 Manual*, eliminate

copyright protection: The government is not the author of the cited work, and whatever the law says regarding the work, the work itself is not the law.

PRA relies on cases involving the starkly different circumstance where a government has *enacted the text* of a private work (there, model building codes) into positive law. But those cases only highlight the gulf between that scenario and this case. Courts have held that the public can copy the text of a law that tracks a model code without infringing the copyright in the original model code. *E.g.*, *Canadian Standards Ass'n v. P.S. Knight Co.*, 112 F.4th 298, 304 (5th Cir. 2024) (citing *Veeck v. S. Bldg. Code Congress Int'l, Inc.*, 293 F.3d 791, 802 (5th Cir. 2002) (en banc)). (PRA's passing merger-doctrine argument (Mot. 16-17) simply repackages this point. *Prac. Mgmt.*, 121 F.3d at 520 n.8.) Those decisions comport with *Georgia* because the later-enacted government code is the work of a "legislative bod[y] acting in a legislative capacity." 590 U.S. at 273. But they do not suggest that a privately authored work enters the public domain whenever a law *refers* to that work. To the contrary, one of PRA's own cases (Mot. 16-17)—the Fifth Circuit's en banc decision in *Veeck*—rejected the logical leap from the model-code-copied-into-law scenario to the context here: Where a law contains "references to extrinsic standards" published by private entities, those standards "do not 'become law' merely because a statute refers to them" or "requires citizens to consult or use a copyrighted work in the process of fulfilling their obligations." 293 F.3d at 804-05; *see, e.g.*, *Nielsen Co. (US), LLC v. Truck Ads, LLC*, 2011 WL 3857122, at *12 (N.D. Ill. Aug. 29, 2011) (stressing same distinction).

So too here. The only laws PRA cites are provisions *referring* to a private work (the *Manual* and the codes within it). PRA may copy the text of such a law that cross-references a copyrighted private work—but not the underlying text of the cross-referenced work itself. PRA points to no law that has repeated the *Manual*'s text verbatim. That is unsurprising because the *Manual*

looks nothing like a model building code that a legislature might enact jot-for-jot. The *Manual* does not require or proscribe any conduct or otherwise "define one's legal obligations." *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 442 (D.C. Cir. 2018) (*ASTM I*). The AHA's work instead facilitates uniform billing practices in commercial transactions through a "common coding language." Compl. ¶ 62. In their capacity as healthcare payers, federal and state governments may condition payment on providers' use of any set of codes they wish—just as any other payer (like a private insurer) could do. ¶ 28. Treating federal and state payers' choice to direct that claims employ the *Manual*'s codes is an especially unusual basis to declare that the *Manual* is equivalent to federal and state law. And the fact that market participants, including government payers, have determined based on decades of experience that a particular work like the *Manual* is useful underscores why it has (and needs) copyright protection in the first place. ¶¶ 31-35.

PRA's position (Mot. 15) that a private work loses copyright protection whenever a person's "legal obligations" depend in some way on the work also would prove far too much. For example, "for generations, state education systems have assigned books under copyright to comply with a mandatory school curriculum," so by PRA's lights, students "cannot comply with the legal requirements without using the copyrighted works." *CCC*, 44 F.3d at 74. But *To Kill a Mockingbird* and *Animal Farm* are still just novels—not the law—and did not enter the public domain the first time a public-school curriculum made them required reading. Other examples abound. The Eleventh Circuit requires parties to conform their citations to "the latest edition of either the 'Bluebook' * * * or the 'ALWD Guide,'" 11th Cir. R. 28-1(j), each a copyrighted private work. But like the Red Book in *CCC*, the Bluebook (happily) is not "the law" (Mot. 16)—and it did not lose copyright protection the first time a court rule required litigants to consult it. Yet PRA's position

requires either equating that style manual with a statute for purposes of copyright protection or else gerrymandering an exception that protects bibliographic guides but not billing codes. In this and other ways, PRA's core submission is simply "antithetical to the interests sought to be advanced by the Copyright Act." *CCC*, 44 F.3d at 74.

***Constitutional considerations undermine PRA's position.*** Unable to square its position with the Copyright Act as written and consistently construed by courts, PRA invokes (Mot. 17-19) constitutional avoidance to contort the statute's settled meaning. But constitutional concerns cut the opposite way: PRA's interpretation would needlessly send the Act careening into constitutionally perilous territory. And the constitutional objections PRA asserts are misdirected.

The constitutional interest at stake here is *the AHA's* interest in protecting its federal copyright from an unlawful taking. Copyrights are a "form of property." *Allen v. Cooper*, 589 U.S. 248, 261 (2020). But PRA's position would allow governments to strip copyrights from private works merely by referring to them by name or by requiring their use. That uncompensated appropriation would violate the Fifth Amendment's Takings Clause. Multiple appellate courts have recognized that the approach PRA advances here would "raise very substantial problems" under the Clause. *Prac. Mgmt.*, 121 F.3d at 520 (quoting *CCC*, 44 F.3d at 74). Those courts avoided that constitutional issue by rejecting PRA's approach as a misreading of the Copyright Act.

Abruptly altering the AHA's rights and destroying the value of its investment also violates due process. When requiring the use of private standards, governments often expressly disavow that their regulations would interfere with copyright protection. *E.g.*, 65 Fed. Reg. at 50,324 (explaining that HIPAA standards will not "divest any copyright holders of their copyrights"); Fla. Admin. Code § 69L-7.100(5) (warning that "posting the publications referenced," including the *UB-04 Manual*, "would constitute a violation of federal copyright law"). Retroactively eliminating

copyright protection after such assurances would deprive authors like the AHA of "fair notice of conduct that is forbidden." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). PRA's position would invite and exacerbate—not avoid—serious constitutional doubts.

Moreover, the constitutional concerns PRA raises (Mot. 17-19) have no footing in the complaint's allegations, are properly directed to federal and state governments, and in any event are overblown. PRA asserts (Mot. 17) that the "fair notice" required by due process mandates "[f]ree publication of the law." No one disputes that the government cannot require compliance with laws regulated parties cannot access. *E.g.*, *Prac. Mgmt.*, 121 F.3d at 519. But if a sovereign really has enacted a law that requires parties to consult and obey a work that is inaccessible, their grievance is properly addressed to *that sovereign*—not to the private author whose work is coopted. The aggrieved party could seek redress against (or defend enforcement action by) the government on due-process grounds. And the Administrative Procedure Act protects the public from enforcement of federal regulations in the Federal Register that "incorporat[e] by reference" any "matter" that is not "reasonably available to the class of persons affected." 5 U.S.C. § 552(a)(1). But PRA cites no case where a party was sanctioned for submitting noncompliant claims for healthcare payment where it lacked fair notice of the applicable standards. And it points to no precedent where a court destroyed one party's private property without compensation to avoid another party's hypothetical concerns about how the government might enforce the law in the future.

PRA's free-speech concern (Mot. 18-19) is likewise a makeweight. When "Congress has not altered the traditional contours of copyright protection, further First Amendment scrutiny is unnecessary." *Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003). That is true here. The historical protection for publishing "statutes and opinions promulgated by government officials," *Rand McNally & Co. v. Fleet Mgmt. Sys., Inc.*, 591 F. Supp. 726, 736 (N.D. Ill. 1983), is inapplicable to

the *Manual*. Mere reference by the government to a private work has never been deemed enough to declare open season to copy the original work freely. Copyright Act of 1909 § 7, 35 Stat. 1077. PRA's breathtaking position breaks with tradition and the consensus of federal courts. *See Prac. Mgmt.*, 121 F.3d at 519-20; *CCC*, 44 F.3d at 73-74. The AHA's copyright is valid.

### B. The No-Contest Provision Bars PRA's Challenge To Copyrightability

The Court can avoid not only any constitutional question but any issue of copyrightability in this case by holding PRA to its own contractual promise not to challenge the copyright's validity. The complaint alleges, and PRA does not dispute, that PRA acknowledged that the AHA "own[s] all copyrights, trademarks, patents, trade secrets and other proprietary rights in and to the Content" in the *Manual* and agreed not to "challenge [the AHA's] proprietary rights in and ownership of the Content." Compl. ¶¶ 103-04 (quoting Doc. 1-3 § 4). This provision independently "doom[s] a challenge to AHA's copyright on the merits," as PRA all but concedes (Mot. 30). Instead, PRA argues that the contract is unlawful under federal and Illinois law. PRA is wrong.

***Federal law does not bar the no-contest provision.*** PRA's contention (Mot. 24-26) that the no-contest provision is "void under federal law" runs headlong into Seventh Circuit precedent. The court of appeals has long held that no-contest provisions are enforceable in the copyright context—distinguishing earlier precedent concerning patents. *See Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1199-1200 (7th Cir. 1987) (citing *Lear v. Adkins*, 395 U.S. 653 (1969)), *abrogated on other grounds as recognized in Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 425 n.12 (7th Cir. 2015). *Saturday Evening Post* expressly adopted two "holding[s] on no-contest clauses," one "broad" and one "narrow": "they are valid in copyright licenses (broad); they are valid when no issue of copyrightability is presented (narrow)." *Id.* at 1201. The Seventh Circuit "emphasize[d]" that "*both* holdings * * * bind the district courts in this circuit." *Id.* (emphasis added).

The first, "broad" holding squarely forecloses PRA's defense (Mot. 24-26) of copyright misuse. *Saturday Evening Post* establishes "that a no-contest clause in a copyright licensing agreement is valid unless shown to violate antitrust law." 816 F.2d at 1200. Although PRA points to language about balancing "the pros and cons of the clause," Mot. 26 (quoting 816 F.2d at 1200), the Seventh Circuit left no doubt that such "balancing is best done under antitrust law," *not* under any "federal common law" of "copyright misuse," 816 F.2d at 1199-1200. PRA may not replace the rigors of antitrust law with PRA's own self-serving, ad hoc weighing of the pros and cons of enforcing the contract terms that it freely accepted in exchange for access to the *UB-04 Manual*.

***Illinois law does not bar the no-contest provision.*** PRA's state-law defense (Mot. 27-28) to the no-contest provision is equally insubstantial. Illinois courts may refuse to enforce a contract on public-policy grounds only "sparingly," when a provision is "clearly contrary" to Illinois law or "manifestly injurious to the public welfare." *Am. Access Cas. Co. v. Reyes*, 1 N.E.3d 524, 527 (Ill. 2013). PRA does not cite a single Illinois case invalidating a no-contest provision in a copyright license. Like the Seventh Circuit, Illinois courts have declined to extend restrictions that apply to no-contest clauses for patent licenses to other types of intellectual property. *See, e.g.*, *Laff v. John O. Butler Co.*, 381 N.E.2d 423, 433-34 (Ill. App. Ct. 1978).

PRA's particular public-policy arguments here are insignificant. It invokes Illinois's Freedom of Information Act—a source that, like a "state law" objection rejected out of hand in *Saturday Evening Post*, is "too remote to be illuminating" and "requires no extended discussion." 816 F.2d at 1199. To the extent PRA argues that Illinois courts would import federal public policy, that federal policy issue is settled by *Saturday Evening Post*, which held that a no-contest provision *furthers* the aims of federal copyright law. As the Seventh Circuit explained, "[w]ithout [the no-contest clause] the licensee always has a club over the licensor's head" via "the threat that if there

is a dispute the licensee will challenge the copyright's validity"; allowing licensees to escape a contractual pledge forswearing such a challenge "would discourage copyright licensing and might therefore retard rather than promote the diffusion of copyrighted works." *Id.* at 1200.

### C. Posting Of The Entire *UB-04 Manual* Online Is The Antithesis Of Fair Use

The most extreme example of PRA's effort to import its own allegations outside the complaint is its final defense to infringement: that "releasing the *Manual* to the public is fair use." Mot. 19. Fair use, a paradigmatic affirmative defense, "typically turn[s] on facts not before the court" at the pleading stage. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). Even PRA's favored case resolved the "highly fact-intensive" fair-use defense only after the parties developed a full record for cross-motions for summary judgment. *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 82 F.4th 1262, 1266-67 (D.C. Cir. 2023) (*ASTM II*). PRA's fair-use defense cannot be sustained based on the complaint's allegations, and that defense will fail as a matter of law even with future factual development.

***Purpose and character of the use.*** The "purpose and character of [PRA's] use," 17 U.S.C. § 107(1), cuts decisively against fair use. PRA threatens to post the entire *Manual* so that it is "freely available" to the world. Compl. ¶ 6; Doc. 1-4 at 1. Such copying "merely supersedes the objects of the original creation," thus "supplanting the original," without "add[ing] something new, with a further purpose or different character." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023) (internal quotation marks omitted). Even if PRA does not seek "commercial gain," reproducing "verbatim or near-verbatim copies" undermines its fair-use defense. *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 60-61 (1st Cir. 2012); *see, e.g.*, *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 629-30 (7th Cir. 2003) (teacher's publishing six whole copyrighted standardized tests for the purpose of criticizing them was not fair use).

PRA's response that it aims to provide "'free' access to 'the law,'" Mot. 20 (citation omitted), is wrong as explained above: The *Manual* is not the law. See pp. 14-18, *supra*. Every circuit to decide the issue has rejected PRA's position that private standards become the law because a statute or regulation refers to them. Even PRA's own favorite fair-use case reserved that issue. *ASTM I*, 896 F.3d at 447. If PRA loses on that issue, it loses on the first fair-use factor as well.

***Nature of the copyrighted work.*** The second factor—"the nature of the copyrighted work," 17 U.S.C. § 107(2)—also undermines fair use. As the complaint details (¶¶ 34-42), the taxonomy of codes and explanatory material in *UB-04 Manual* reflects just the kind of original expression—reflecting the author's choices of what to say (and how) and what to omit—that copyright law means to encourage. *Am. Dental Ass'n*, 126 F.3d at 980-81; *Prac. Mgmt.*, 121 F.3d at 518-19. Unlike a factual "collection of best practices," Mot. 21, the *Manual*'s codes, commentary, and instructions embody original expression and authorial judgments—such as whether to adopt a proposed new code or modify or eliminate an existing one—that require balancing (*inter alia*) the benefits of increased precision against the costs of capturing additional detail. *E.g.*, Compl. ¶ 38.

***The portion of the work used.*** The third factor—how much of the *Manual* PRA seeks to pirate, 17 U.S.C. § 107(3)—is simple: PRA plans to post "the entire *Manual*." Doc. 1-4 at 2-3; *see* Mot. 21. The wholesale copying PRA threatened means it loses this factor and also confirms that it loses the first factor: The "'portion used'" must be "reasonable in relation to the purpose of the copying." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994). That PRA plans to post the entire *Manual*—not to isolate any portion supposedly relevant to facilitating "price transparency," Mot. 8—confirms that its aim is impermissible substitution. *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1118-19 (9th Cir. 2000). PRA's assertion (Mot. 21) that it must post the whole *Manual* because it is "the law" is asked and answered.

***Effect of the use on the market for the work.*** Finally, "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4), is the nail in the coffin for PRA's pleading-stage fair-use defense. This factor is "the single most important." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985). PRA ignores the complaint's allegations that its use will harm the financial incentives to maintain the *Manual*. *E.g.*, ¶¶ 36, 74. Those allegations—and all reasonable inferences in *the AHA's* favor—must be taken as true. *Vullo*, 602 U.S. at 195. And they accord with common sense. If PRA could post the whole *Manual* so that it can be "downloaded for free from the Internet," then "many people are bound to keep the downloaded [version] without buying originals." *BMG Music v. Gonzalez*, 430 F.3d 888, 890 (7th Cir. 2005); *accord Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 195 (2d Cir. 2024) (where infringer's use of a copyrighted work would be a "replacement for the originals, it is reasonable and logical to conclude * * * it would decimate Publishers' markets"). PRA's use takes dead aim at "the economic incentive for the [AHA] to produce and maintain" the *Manual* and would "prove destructive of the copyright interest." *Prac. Mgmt.*, 121 F.3d at 518.

PRA never engages with those plausible allegations and instead offers (Mot. 21-24) conjecture and inventive inferences it would draw in its *own* favor. That is not how Rule 12 works. And PRA's retreat (Mot. 24) to the First Amendment "adds nothing to the fair use defense." *Chicago Bd.*, 354 F.3d at 631; *see* pp. 19-20, *supra*. Dismissal on fair-use grounds is plainly unwarranted.

## II. The AHA Stated A Complete Claim Of Breach Of The Confidentiality Provisions

Copyright infringement is only half of PRA's problem. As set forth in Count II of the complaint, PRA voluntarily entered a license agreement when it acquired the 2026 edition of the *Manual*, in which it agreed (twice over) not to disclose that *Manual* to others. Compl. ¶¶ 47-55,

59-60, 82-95; Doc. 1-3 §§ 1, 4. Independent of copyright law, PRA's threatened publication of the *Manual* on the Internet for anyone to access violates its contractual obligations.

PRA's motion to dismiss does not deny that the AHA has plausibly pleaded every element of its claim. PRA does not dispute that it formed a contract by purchasing the *Manual* and entering the license agreement. Compl. ¶¶ 83-88. Nor does PRA contest that it agreed specifically not to disclose the *Manual* to anyone else. ¶¶ 90-91 (citing Doc. 1-3 §§ 1, 4). And it makes no argument that posting the *Manual* online somehow comports with that contractual pledge of confidentiality. PRA curiously stresses (Mot. 28) that the license agreement it entered for the 2026 edition of the *Manual* does not apply to other years' editions, but that is a sideshow: PRA admittedly acquired and threatened to publish the 2026 edition (and to sue the AHA if it did not acquiesce to PRA's piracy), so the AHA sued to protect that work. Compl. ¶¶ 58-65. In any event, questions about the scope of eventual relief or preclusive effects are premature. Rule 12(b)(6) "doesn't permit piecemeal dismissals of *parts* of claims." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015). What matters is that the AHA plausibly alleged every element of its contract claim.

Instead, PRA once again interposes affirmative defenses, but here too they provide no basis for dismissal. It contends (Mot. 24-28) that federal copyright law and Illinois public policy forbid enforcement of the confidentiality clause, but that contention is legally incorrect at every turn.

### A. Federal Law Poses No Bar To The License's Confidentiality Provision

PRA's argument that federal copyright law forbids the confidentiality provision lacks any basis in the Copyright Act. The Act preempts only a narrow band of state laws—namely, just those that grant "equivalent right[s]" to "any of the exclusive rights within the general scope of copyright." 17 U.S.C. § 301(a). The Seventh Circuit has held that "rights created by contract" are *not* "'equivalent to any of the exclusive rights within the general scope of copyright.'" *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1454 (7th Cir. 1996). Section 301 thus does not "interfere with

private transactions in intellectual property" or disturb "rules that respect private choice." *Id.* at 1455; *cf. Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 264 (1979) (holding that principle that state law cannot extend patent to ideas in public domain does not "justif[y] relieving [a party] of its contract obligations"). The Act's on-point provision leaves state contract law undisturbed.

Case law applying that principle makes clear that the Copyright Act does not nullify private agreements governed by state law not to engage in use or copying that federal copyright law would allow. The Seventh Circuit has enforced contractual provisions prohibiting dissemination of un-copyrightable material. *ProCD*, 86 F.3d at 1455; *see id.* at 1449 (discussing a "computer database" of "more than 3,000 telephone directories" that "cannot be copyrighted"). Courts have likewise held that a copyright holder may enforce contractual rights to prevent copying that would otherwise be fair use. *Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317, 1325-26 (Fed. Cir. 2003); *accord, e.g.*, *Davidson & Assocs. v. Jung*, 422 F.3d 630, 639 (8th Cir. 2005) (agreeing that "a state can permit parties to contract away a fair use defense" (citation omitted)). The Seventh Circuit has since cited *Bowers* as illustrating that "[c]ourts rarely, if ever, hold that federal intellectual property law preempts a 'simple two-party contract,' which binds only the parties to the contract and therefore does not frustrate federal policies." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 544 (7th Cir. 2021) (quoting *ProCD*, 86 F.3d at 1455; citing *Bowers*, 320 F.3d at 1323-26).

Boxed in by the statute and binding precedent, PRA avoids framing its argument explicitly in preemption terms, but its repackaging fails all the same. PRA tries (Mot. 24-26) to resurrect the same anti-parallel-claim theory that courts have uniformly rejected under § 301 using the label of "copyright misuse." But that doctrine is not a defense to a *contract* claim and would not apply here in any event.

Copyright misuse is irrelevant to Count II, which states a claim for breach of contract. Copyright misuse is a "defense to *infringement*," *Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640, 647 (7th Cir. 2003) (emphasis added), not a defense that can be engrafted onto "state law claims," *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011); *see also Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1169 (1st Cir. 1994) (distinguishing "'copyright misuse' defense to a federal copyright infringement claim" from "'unclean hands' defense to the state claim for misappropriation of trade secrets"). PRA quotes the Seventh Circuit's decision in *WIREdata* as approving copyright misuse as "a 'defense' * * * 'to enforcing any contract.'" Mot. 24 (quoting 350 F.3d at 647; brackets omitted). But the very sentence from which PRA clips those words out of context makes clear that no contract claim was at issue in the case: "WIREdata is not a licensee of AT, and AT *is not suing to enforce any contract it might have* with WIREdata." 350 F.3d at 647 (emphasis added). The opinion elsewhere confirms that no contract claim was presented. *See id.* at 642 (reviewing injunction issued "on the basis of [the plaintiff's] copyright claim alone"); *id.* at 646 (distinguishing *ProCD* and *Bowers* because defendant was "not a party" to the license agreements). Far from establishing copyright misuse as a defense to contract claims, *WIREdata* leaves no doubt that the Seventh Circuit had no occasion to address that issue. PRA's other cited authority likewise did not extend copyright misuse as a defense to contract claims. *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 972, 973 n.7 (4th Cir. 1990) (explaining that "misuse of copyright bars a culpable plaintiff from prevailing on an action for infringement of the misused copyright" and that the "finding of breach of contract" was not at issue on appeal).

Even if copyright misuse could be a defense to breach of contract, PRA could not establish that defense here, let alone on "the face of the complaint." *Holmes*, 141 F.4th at 822. The Seventh Circuit has questioned whether copyright misuse is cognizable at all "unless it rises to the level of

an antitrust violation." *WIREdata*, 350 F.3d at 647; *see Philips N. Am. LLC v. Glob. Med. Imaging, LLC*, 2024 WL 4240920, at *14 (N.D. Ill. Sept. 19, 2024). But PRA eschews antitrust and makes no argument that the complaint's allegations show an antitrust violation.

Instead, PRA appears to argue (Mot. 25) that asserting *any* contractual right to prevent disclosure that copyright law would not prohibit is copyright misuse. But that cannot be correct. Courts routinely enforce contracts that forbid disclosure of uncopyrightable works and prevent copying that would qualify as fair use. *ProCD*, 86 F.3d at 1455; *Bowers*, 320 F.3d at 1325-26. To be even in the ballpark of copyright misuse, PRA at least must establish that the AHA leveraged its copyright "in pursuit of an anticompetitive end." *Reed-Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909, 913 (7th Cir. 1996); *see, e.g.*, *Prac. Mgmt.*, 121 F.3d at 521 (holding that "[c]onditioning the license on [the government's] promise not to use competitors' products constituted a misuse of the copyright" in a set of billing codes); *Lasercomb*, 911 F.2d at 978 (condemning inclusion of "non-compete provisions" in license to use copyrighted materials). PRA cites no case where a court suggested that a person misused a copyright by licensing its own creation subject to confidentiality provisions. *Cf. WIREdata*, 350 F.3d at 646 (suggesting that defendant may have misused copyright in database structure by preventing licensees "from revealing *their own* data"). Even if copyright misuse were a cognizable defense to a contract claim, PRA's sweeping theory would fail.

**B. Illinois Law Does Not Invalidate PRA's Contractual Commitment**

State law also gives PRA no excuse to escape the confidentiality provision. PRA again invokes (Mot. 27-28) Illinois's FOIA, but it does not arguably, much less "clearly," guarantee free access to the *UB-04 Manual*. *Reyes*, 1 N.E.3d at 527; *see* 5 Ill. Stat. 140/1 § 1 (adopting policy of access to "the affairs of government" and "official acts and policies"); *see also* 50 Ill. Adm. Code § 2908.50 (authorizing use of UB-04 codes to process "workers' compensation transactions"). PRA's public-policy arguments otherwise reprise (Mot. 27) its theories addressed above that the

*Manual* itself is federal law or a federal-government work. And its arguments that Illinois law imports federal policies runs headlong into *Life Spine*, where the Seventh Circuit held that agreements that "bin[d] only the parties to the contract" do "not frustrate federal policies." 8 F.4th at 544.

**III. The AHA Stated A Complete Claim Of Breach Of The No-Contest Provision**

Count III states a valid claim of anticipatory breach of the no-contest clause. Compl. ¶¶ 59-60, 96-110. Once again, the AHA plausibly alleged every element, and once again PRA offers no response relevant to the Rule 12 inquiry. PRA does not dispute the complaint's allegation that the parties formed a contract—the license agreement. ¶ 99. Nor does PRA deny that, despite promising not to challenge the AHA's copyright in the *UB-04 Manual*, it soon threatened to do just that in its demand letter—a textbook anticipatory breach. ¶¶ 103-04, 106 (citing Doc. 1-3 § 4); *see* Doc. 1-4 at 1-3; *see also Bituminous Cas. Corp. v. Com. Union Ins. Co.*, 652 N.E.2d 1192, 1197 (Ill. App. Ct. 1995). The AHA then sought textbook contractual remedies: a declaratory judgment and damages. Compl., Prayer for Relief (B), (F). PRA has since contested the copyright protection for the *Manual* in this litigation, Mot. 10-19, bringing its once-anticipated breach to fruition and causing concrete harm to the AHA.

PRA caricatures (Mot. 30) that claim as seeking exotic and unavailable remedies, such as an "antisuit injunction," and then seeks dismissal of the claim in its entirety on the theory that the only potential remedies are legally off-limits. But PRA distorts the commonplace relief the AHA seeks and again misunderstands the role of a motion to dismiss. Merely arguing that a plaintiff "is seeking relief to which [it is] not entitled" is not a basis for "dismissal of the suit." *Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002). PRA's contention that various remedies are unavailable is no basis for dismissing a claim unless the Court could grant *no* relief at all on that claim—not even "a partial remedy," such as "nominal damages." *Uzuegbunam v. Preczewski*, 592 U.S. 279,

291 (2021) (citation omitted). Here, this Court could easily redress the AHA's injury on Count III through garden-variety remedies.

For example, declaratory relief is available because the parties' dispute is "definite and concrete, touching the legal relations of parties having adverse legal interests," "real and substantial," and fit for "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted). A declaration that the no-contest provision binds PRA would provide meaningful relief to the AHA in this dispute: PRA admits (Mot. 30) that the no-contest provision, if valid, "doom[s] a challenge to AHA's copyright on the merits." That mine-run remedy is hardly the bespoke "antisuit injunction" PRA posits. *Id.* It is a judicial determination that the contract means what it says and binds the parties. Although declaratory relief here (as is typical) *also* will likely clarify the parties' rights relevant to future disputes, *NUCOR Corp. v. Aceros Y Maquilas de Occidente*, 28 F.3d 572, 578-79 (7th Cir. 1994), that hardly means the Court cannot grant the AHA relief in *this* dispute today.

This Court also could award damages that restore the AHA to the position it would have occupied, had PRA not challenged the *Manual*'s copyright. The AHA may recover legal expenses as "ordinary damages." *Sorenson v. Fio Rito*, 413 N.E.2d 47, 52 (Ill. App. Ct. 1980). PRA's attempt to recast the complaint as seeking attorney's fees not authorized by law misconceives the AHA's claim. Legal expenses are an ordinary—indeed, paradigmatic—item of damages stemming from the breach of a contractual commitment not to commence or force litigation. What is extraordinary is PRA's position that its promise to respect the AHA's copyright is categorically unenforceable by a court and that PRA may flagrantly violate that contractual pledge with impunity.

## CONCLUSION

The Court should deny PRA's motion to dismiss.

Dated: March 27, 2026

Respectfully submitted,

*/s/ Jonathan C. Bond*

Jonathan C. Bond (*pro hac vice*)
Elizabeth P. Papez
Howard S. Hogan (*pro hac vice*)
Heather L. Skrabak (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
JBond@gibsondunn.com
EPapez@gibsondunn.com
HHogan@gibsondunn.com
HSkrabak@gibsondunn.com

Patrick J. Fuster (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Phone: (213) 229-7000
PFuster@gibsondunn.com

*Counsel for Plaintiffs American Hospital Association and Health Forum LLC*